Donald Joseph BATTIG et al.

v.

The HARTFORD ACCIDENT AND
INDEMNITY COMPANY et al.

No. 18941.

United States District Court,
W. D. Louisiana,
Monroe Division.

Sept. 13, 1977.

was and is owned and operated by the Catholic Diocese of Alexandria. St. Mary's admitted Keith as a result of an application for admission accepted by letter from the school. The application, signed by his parents, Donald Joseph Battig and Patricia Maxine Battig, contains a number of "agreements" respecting the terms of acceptance.

Keith became ill about April 24, 1972, running a high fever and suffering pain in his abdomen and right leg. He was admitted to the infirmary at St. Mary's on April 24. On April 26, the personnel at St. Mary's took him to Caldwell Hospital and Clinic, Inc., where he was examined. The doctors there diagnosed his condition as pharyngitis, bronchitis and a sore right leg. They administered and prescribed medication and sent Keith back to the school infirmary.

Keith's condition worsened between April 26 and May 2, 1972. On May 2, the staff at St. Mary's again took Keith to Caldwell Hospital and Clinic. The doctor there recommended hospitalization in Baton Rouge, but Keith's parents wanted him to be hospitalized in St. Louis. They made arrangements to fly Keith to Cardinal Glennon Hospital in St. Louis, Missouri.

At Cardinal Glennon, the doctors diagnosed Keith's condition as acute appendicitis and recommended exploratory surgery. Keith was severely dehydrated and very weak, so the surgery could not be performed until the next day, May 3. During surgery, the doctors discovered a ruptured appendix, peritonitis, and an abscess on Keith's right hip.

Keith's condition deteriorated after May 3. On May 11, he underwent surgery to remove additional abscesses. Following hemorrhaging, on May 15, the doctors performed surgery to remove parts of his infected large and small intestines. On May 18, after suffering violent seizures, Keith was placed in a respirator, his right side paralyzed. Keith underwent his fourth major surgery within a short period of time on June 13, 1972, and the doctors removed

Burt W. Sperry, Shotwell, Brown & Sperry, Monroe, La., and Greenfield, Davidson & Mandelstamm, St. Louis, Mo., for plaintiffs.

Jesse D. McDonald, Hudson, Potts & Bernstein, Monroe, La., for Hartford, Winters & Caldwell.

Dan E. Melichar, Gravel, Roy & Burnes, Alexandria, La., Diocese of Alexandria.

## MEMORANDUM RULING

STAGG, District Judge.

In April, 1972, Keith Robert Battig, a moderately mentally retarded child, was enrolled at St. Mary's School for Retarded Children at Clarks, Louisiana. St. Mary's

abscesses from between his liver and kidney. Currently, the child is in a comatose condition, with very limited, uncoordinated movement on his right side.

On April 25, 1973, Donald Joseph Battig, Patricia Maxine Battig, and Keith Robert Battig, represented by his parents, filed an action in negligence against the Hartford Accident & Indemnity Company, Dr. H. H. Winters, III, and the Caldwell Hospital and Clinic, Inc. On December 3, 1973, by an amended complaint, Mr. and Mrs. Battig dropped Keith as a plaintiff and increased their claims for mental anguish. Following motions to dismiss by all defendants, on March 27, 1974, Judge Ben C. Dawkins, Jr. (W.D.La.) dismissed the entire claim of Mrs. Battig against all defendants and he dismissed Mr. Battig's claim for damages for mental anguish against all defendants. Judge Dawkins overruled the motion to dismiss the other claim against the hospital.

By other amendments, the remaining plaintiff, Donald Battig, added other defendants. Most importantly, on September 25, 1974, pursuant to a court order of September 12, he added the Diocese of Alexandria as a defendant by amended complaint. He claimed that the Diocese was liable as a joint tortfeasor with Dr. Winters, listed the alleged negligent acts, which included the failure to provide care for Keith by the appropriate standard, and claimed that the Diocese had breached a contract to provide medical services for Keith under the supervision of a physician.

On July 26, 1977, the Court signed a judgment dismissing the claims against Dr. Winters and all other defendants except the Diocese because of amicable settlements. On August 15, 1977, the Diocese moved to amend its answer and the Court allowed the amendment. The Diocese sought to reduce any eventual judgment by one-half, to assert charitable immunity and the defense of prescription and to assert the defense of equitable estoppel. On August 31, 1977, the Diocese filed a motion for leave to amend the answer once again to include the affirmative defense of release. The court allowed the amendment.

Also, on August 31, 1977, the Diocese filed a motion to dismiss for failure to state a claim upon which relief could be granted and a motion for summary judgment. The Diocese claims that any tort action by any Battig family member has prescribed, that there never was a contract or a quasi-contract to breach, that if the Court finds that there was a contract or quasi-contract, that any claim pursuant to a breach of that contract or quasi-contract has been released, and that if there was no release of a contract, that the Battigs agreed to indemnify the Diocese for any losses it may have suffered.

This action was filed pursuant to the Court's diversity jurisdiction. The Court is bound to apply the law of the situs state. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, Louisiana law applies in this case.

## TORT CLAIM

The Diocese has moved for summary judgment on the tort claim by Donald Battig, on behalf of himself and as administrator for his son's estate, on the grounds of prescription. Plaintiff argues that either prescription was interrupted, or the action did not accrue until January 14, 1974, and the action against the Diocese was filed within one year of that date. Neither argument can prevail.

■ Under Louisiana law, actions based on offenses and quasi-offenses prescribe in one year. La.Civ.Code Art. 3536. An action against a co-obligor *in solido* interrupts prescription as to all other solidary obligors. La.Civ.Code Art. 2090. Joint tortfeasors are solidary obligors.

Plaintiff has stated that he has no intention to offer evidence concerning the negligence of Dr. Winters, the alleged joint tortfeasor with the Diocese:

"The undersigned counsel was asked by attorneys for the Diocese of Alexandria if we were going to introduce evidence regarding Dr. Winters' negligence to establish Dr. Winters and the Diocese of Alexandria were liable insolido [sic]. We ad-

vised that we do not intend to introduce such evidence." Pretrial brief of Donald Joseph Battig.

Consequently, plaintiff will be unable to show that Winters and the Diocese were joint tortfeasors. He cannot prove that the lawsuit against Dr. Winters interrupted prescription against the Diocese as a joint tortfeasor. Any event that would create liability on the part of the Diocese occurred at the latest on May 2, 1972. The action against the Diocese was not filed until September, 1975, much longer than a year following the date of the last event. Thus, the tort claim against the Diocese has prescribed.

Plaintiff has proposed another novel argument to avoid the motion based on prescription; he contends that a change of law regarding charitable immunity in Louisiana prevented his action from accruing prior to January 14, 1974. Plaintiff contends that prior to January 14, 1974, Louisiana law was clear that charitable immunity applied in this state; thus, plaintiff had no action prior to that date. On January 4, 1974, the Louisiana Supreme Court decided *Garlington v. Kingsley,* 289 So.2d 888 (La.1974), holding that charitable immunity never did apply in Louisiana. Plaintiff's argument, citing *Wilkinson v. Wilkinson,* 323 So.2d 120 (La.1975), is that his cause of action accrued on January 14, 1974, because prescription cannot begin to run against a claim when the claim cannot be exercised. Having filed within a year of the first day on which he could exercise his right, plaintiff argues that his tort claim has not prescribed.

Plaintiff's argument must be rejected based upon the very language of the *Garlington* case. In *Garlington,* the Louisiana Supreme Court acknowledged the weak authority of *Grant v. Touro Infirmary,* 254 La. 204, 223 So.2d 148 (1969), the case on which many parties had relied for the proposition that charitable immunity did exist in Louisiana. Justice Barham pointed out that *Grant* was a mere plurality opinion. He then analyzed the law of Louisiana and concluded that there was no authority in the civil law of Louisiana for charitable immunity. The Court then overruled *Grant* to the extent it was necessary to do so.

■ *Garlington* did not change Louisiana law. As the *Garlington* court stated, in a civil law jurisdiction, the legislature, not the court, is impowered to make law. 289 So.2d at 92–93. *Garlington* merely was a change in the interpretation of the law. Thus, its effect was retroactive. *Jackson v. Doe,* 296 So.2d 323 (La.1974); *Heirs of Fruge v. Blood Services,* 506 F.2d 841 (5th Cir. 1975). As a result of the retroactivity, all claims, even those arising out of facts occurring before the decision, were viable on the date of the decision. But the claims did not accrue from the date of the decision; rather, they related back to the time of the occurrence of the event.

■ Clearly, under *Garlington,* the claims against charitable institutions arose on the date of the occurrence of the event, rather than the date of the *Garlington* decision. This interpretation is bolstered by an analysis of the logical extension of plaintiff's argument. If the Court were to accept plaintiff's argument, then every claim against a "charitable institution" would accrue from the date of the *Garlington* decision. Such a rule would affect cases even ten or twenty years old, and would devastate the public policy underlying prescriptive periods. Thus, in this case, the action accrued against the Diocese no later than May 2, 1972. The claim against the Diocese was brought well over one year following that date. Thus, the action has prescribed. La.Civ.Code Art. 3536.

The action against the Diocese, in tort has prescribed, and summary judgment is appropriate in favor of the defendant as to the tort claim.

### CONTRACT CLAIM

■ In his original claim against the Diocese, the plaintiff based a contract claim on Paragraph VIII of the application:

"VIII. St. Mary's reserves the right to provide medical, dental, or nursing care as directed by a physician or dentist, be it in the school clinic or in the hospital, and

such emergency treatment, including surgery, as may be deemed necessary."

Plaintiff claimed that the clause obligated the Diocese to provide medical services under the care of a physician.

Now plaintiff apparently has abandoned that claim. In his pretrial brief, he admitted that Paragraph VIII did not create an obligation to provide medical services; it merely granted authorization for the school to treat the child. Therefore, there was no express or implied contract to provide medical services or to treat Keith Battig in a particular manner.

The claim that Donald Battig is entitled to damages for breach of contract must be dismissed, and the motion by the defendant for summary judgment with respect to that claim must be granted. Because there was no contract, the Court may avoid the delicate decision whether one may execute a release of a claim for breach of contract in the very contract itself.

## QUASI–CONTRACT CLAIM

Because the tort claim against the Diocese has prescribed, and no express or implied contract to provide medical services ever existed, the only remaining claim against the Diocese is one in quasi-contract. The existence *vel non* of a quasi-contract is a difficult determination with many possible legal and social consequences. The defendant has claimed that by a separate article in the application the plaintiff released any claim pursuant to a quasi-contract. If the alleged release did cover any possible claim of quasi-contract, then the Court need not consider whether the circumstances of this case gave rise to a quasi-contract. The Court has determined, for reasons stated below, that Paragraph IX of the application contained a release broad enough to release any possible claim under a theory of quasi-contract. Thus, the Court need not consider whether, by providing nursing care to Keith Battig, the Diocese became obligated to his parents in quasi-contract. Any such obligation had been released by the parents in Paragraph IX of the application for admission to St. Mary's.

## RELEASE

Paragraph IX of the application states the terms of the release:

"IX. It is agreed and understood that if this applicant is accepted, St. Mary's School for Retarded Children, the Diocese of Alexandria, the Bishop of Alexandria and all other persons acting in their behalf shall be and they are hereby released from *any and all liability of every nature, kind and description as a result of any injuries, hurt or damage sustained by the child herein described.* (Emphasis added.)

Donald Battig signed the application, which St. Mary's, and thus the Diocese, accepted.

Battig claims that additional language in Paragraph IX of the application causes the clause to be wholly an indemnity clause. He cites the second sentence:

"Applicant (whether one or more) agrees to indemnify and hold harmless St. Mary's School, the Bishop of Alexandria, the Diocese of Alexandria and any persons acting for them from any loss or claim of any kind which may be made against them."

The Court cannot agree. In interpreting a contract, the Court must determine the intent of the parties from the words of the contract when those words are clear and explicit and lead to no absurd consequences. La.Civ.Code Art. 1945(3). Paragraph IX is clear and explicit. In generally understood terms, it purports to be a release, followed by a hold harmless agreement, or indemnification clause. Such an interpretation does not lead to absurd consequences. The Court must read the contract as it is written, containing both a release and an indemnity clause.

There is no dispute about the language in the application. The interpretation of that language, and its effect, is a matter of law. Thus, the interpretation of the release is a matter appropriate for decision by summary judgment. All that remains is for the Court to interpret the scope of the release.

■ Louisiana Civil Code Article 2199 contains a simple statement concerning the remission or release of debts:

"The remission of the debt is either conventional, when it is expressly granted to the debtor either having a capacity to alienate;

"Or tacit, when the creditor voluntarily surrenders to his debtor the original title under private signature which establishes the obligation."

The Civil Code does not prescribe a certain form, and a release need not be in writing.

■ Generally, questions concerning a release involve an interpretation of the scope of the release. The parties may agree to release any claim, even one of future liability, although they cannot release liability for future intentional wrongs. See *Hayes v. Hayes*, 8 La.Ann. 468 (1852).

Plaintiff claims that a release, to include liability for further negligent acts, must refer specifically to negligent acts. He relies principally on *Cole v. Chevron Chemical Company-Oronite Division*, 477 F.2d 361 (5th Cir. 1973), *Diamond Crystal Salt Company v. Thielman*, 395 F.2d 62 (5th Cir. 1968), and *Jurisich v. United Gas Pipeline Company*, 349 F.Supp. 1227 (E.D.La.1972). The defendant claims that the clause need not be so specific, so long as the intent of the parties is clear. It relies heavily on *Polozoa v. Garlock, Inc.*, 343 So.2d 1000 (La. 1977).

The language of the indemnity agreement at issue in *Cole* was narrow. It purported to indemnify the contractor for "all loss, damage, injury, liability, and claims thereof for injuries to or death of persons, and all loss of or damage to property of others, resulting directly or indirectly from CONTRACTOR'S performance of this contract." The Court found that negligent acts were not directly or indirectly connected with the indemnitee's performance of the contract. The Court did state that to be indemnified against an action for negligent acts, the indemnity agreement must state that it covers "negligent acts". However, the Court did not cite a single Louisiana Supreme Court case in support of its contention.

In *Diamond Crystal Salt Company v. Thielman*, 395 F.2d 62 (5th Cir. 1968), the Court analyzed the indemnity Agreement in terms of assumption of risk, and concluded that the indemnitor had not assumed the particular risk. The Court did not cite a single Louisiana Supreme Court case, with the exception of *Hayes v. Hayes*, 8 La.Ann. 468 (1852), which merely holds that a party cannot release a claim for future intentional torts.

The language on which plaintiff relies from *Jurisich v. United Gas Pipeline Company*, 349 F.Supp. 1227 (E.D.La.1972), is mere dictum. The case was decided according to federal maritime law, although it compared that law to Louisiana law. In his opinion, Judge Rubin did not state that an indemnity or release agreement must specifically mention negligent acts to cover negligent acts. He merely stated that the intention of the parties must be clear, that it must be expressed with sufficient clarity to indicate the parties' true intention. Once more, the case does not cite any Louisiana Supreme Court opinion.

The Louisiana Supreme Court recently had addressed a similar question to the one presented by this case. In *Polozoa v. Garlock, Inc.*, 343 So.2d 1000 (La.1977), the contract at issue did refer specifically to negligent acts. The Court approved the agreement as covering negligent acts, but it did not require a reference to negligent acts as a precondition to its decision. It merely stated that "a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms." 343 So.2d at 1003.

*Jurisich* and *Polozoa* best state the rule of Louisiana law. Louisiana does not require a specific reference to negligent acts in order for an indemnity agreement or a release to cover claims based on negligent acts. However, the intention of the parties, as inferred from the language of their agreement, must clearly indicate an inten-

tion to include negligent acts within the indemnity agreement or the release.

In this case, the release covers "any and all liability of every nature, kind and description as a result of injuries, hurt or damage sustained by the child." The only claim to be released by such a clause would have been one for damages for a negligent or intentional act, whether it be tortious or contractual, resulting in an injury to the child. Parties may not release liability for future "immoral" or intentional acts. *Hayes v. Hayes*, 8 La.Ann. 468 (1852). Thus, if the clause did not cover negligent acts resulting in injury to the child, whether their origin be *ex delicto* or *ex contractu*, it would be meaningless. La.Civ.Code Art. 1951. The language of the agreement is unequivocal; it is broad enough to cover any alleged negligent breach of quasi-contract. Plaintiff therefore released the Diocese from any remaining liability based on an alleged breach of quasi-contract in this case. For that reason, defendant is entitled to summary judgment against plaintiff on the quasi-contract claim.

## SUMMARY

There is no dispute as to any material fact. Any possible disputes have been resolved in favor of plaintiff as the party adverse to the motion for summary judgment. Indeed, the opening statement of facts came from plaintiff's original complaint. The Diocese is entitled to judgment as a matter of law on all counts of the complaint. Thus, summary judgment is appropriate in favor of the Diocese of Alexandria. F.R.C.P. 56.